44 N.J. Super. 193 (1957)
129 A.2d 758
S.D. WALKER, INC., A CORPORATION, PLAINTIFF,
v.
BRIGANTINE BEACH HOTEL CORPORATION, A CORPORATION, LOWELL HOLDING CORPORATION, J & J DISTRIBUTING COMPANY, A CORPORATION, DANIEL WOLFE, AND ATLANTIC COAST FISH CO., A CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 1, 1957.
*196 Mr. William E. Stringer, attorney for plaintiff.
Mr. Emerson Richards, attorney for defendant Brigantine Beach Hotel Corporation.
GOLDMANN, J.S.C.
Plaintiff brings this foreclosure action as subsequent assignee of a $100,000 mortgage given by defendant company to Sara S. Washington (later Sara S. Washington Logan), now deceased, covering its hotel property at Brigantine, New Jersey. The complaint alleges the following defaults under the bond and mortgage and the mortgage extension agreement entered into between Mrs. Logan's executors and the defendant: (1) non-payment of $2,000 interest which fell due April 3, 1956; (2) non-payment of municipal taxes for the first two quarters of 1956; (3) non-production of receipts for tax installment *197 payments within ten days of such payments; and (4) non-payment of installments on account of mortgage principal in the respective amounts of $2,000 in 1955 and $3,000 in 1956.
Only the defendant hotel company answered. It claims that plaintiff may not foreclose because on June 4, 1956 (the actual date was June 1) defendant paid all taxes then due, and on that date also made written tender to plaintiff of the interest due April 3, 1956, as well as the $2,000 installment of mortgage amortization then believed to be due, together with interest on both these sums from April 3 to June 4, 1956. Accompanying this written tender was a certified check in the sum of $4,041.37. Defendant says its tender has been a continuing one, and it has been and is willing to make immediate payment of not only the $4,041.37 but any other sums that may be due plaintiff under the mortgage. The tender has been rejected although, defendant alleges, plaintiff's president first took the check into his possession but later returned it. Further, defendant claims that plaintiff has never given formal notice of its election to default the mortgage, nor ever demanded payment of interest, taxes or amortization. It contends that any delay in paying taxes and interest before this action was instituted was due to pending negotiations with Mrs. Logan's residuary legatees for the purchase of the mortgage, and also the understanding between the hotel company and Mrs. Logan, the original mortgagee, permitting it to pay taxes and interest during the summer season when funds were available. Defendant insists that it acted with dispatch to cure any alleged default or defaults when it paid all taxes due and made its June 4, 1956 tender, inasmuch as it had been unable to ascertain to whom the residuary legatees (the first assignees of the mortgage) had assigned the mortgage, no notice of the later assignment to plaintiff having come to defendant's attention until it was recorded on May 25, 1956.
It is admitted that the first and second quarter taxes for 1956 became due February 1 and May 1, respectively; that a half year's interest fell due on April 3, 1956; that the residuary legatees served notice of default on defendant on *198 May 15, 1956 demanding payment of the mortgage in full; and that defendant paid all taxes due and delinquent on June 4, 1956 (June 1).
The core issue for determination is whether, in the circumstances here presented, defendant had defaulted under the terms and conditions of the bond and mortgage and the extension agreement; and if there was a default, is plaintiff in equity and good conscience entitled to foreclose at this time?
The $100,000 bond and mortgage were given by defendant to Sara S. Washington (Logan) on April 3, 1950, payable in three years, with interest at 4%. The instruments included the usual 30-day default clause for failure to pay taxes or semi-annual interest or to produce tax receipts within ten days after payment, the whole principal to become due and payable immediately at the option of the mortgagee, her heirs or assigns.
The hotel company fell into difficulties soon after; receivership proceedings were brought against it in our former Court of Chancery at the close of 1950, and the company then sought relief in the federal courts under the Bankruptcy Act, 11 U.S.C.A. § 1 et seq. It apparently was not discharged until April or May 1953, interest and taxes meanwhile having fallen far in arrears. At this point the executors of the Logan estate, with the approval of the referee in bankruptcy, wrote defendant on May 20, 1953 agreeing to extend the mortgage for ten years on certain terms and conditions, among them payment of back taxes and interest. The extension was to run from April 3, 1953, with interest at 4%, principal to be amortized according to a schedule later incorporated in a formal extension agreement described below.
Mrs. Logan, the original mortgagee, died testate March 23, 1953, leaving her residuary estate (into which the mortgage fell) in equal shares to Joan Washington (Hayes) and Joshua Wynn of Atlantic City, Verna Gosnell of Baltimore, Maryland, and Ida Ellen Phillips Johnson of Reading, Pennsylvania. She named William Gosnell of Baltimore and William *199 A. Dart of Atlantic City, executors, and William E. Stringer, Atlantic City attorney, proctor. Shortly after, these four residuary legatees entered into an agreement with Shumpert Logan, decedent's husband, of Atlantic City, that he would share equally with them in the residuary estate.
The hotel company paid off back taxes and interest, as had been agreed with the executors, and undertook to pay quarterly taxes and semi-annual interest thereafter, although on an irregular schedule. Many payments were made within the 30-day grace period, but the following were paid outside the grace period: 1954 taxes, second quarter (61 days late), third quarter (173 days late) and fourth quarter (81 days late)  the third and fourth quarters were paid on January 20, 1955; 1955 taxes, first quarter (246 days late), second quarter (157 days late) and third quarter (65 days late)  these three quarters were paid October 4, 1955  and fourth quarter (61 days late). It has already been noted that the taxes due February 1 and May 1, 1956 were not paid until June 1, 1956, after notice of default and before action begun.
Semi-annual interest of $2,000 was paid outside the grace period as follows: that due April 3, 1953, paid 123 days late; that due April 3, 1954, balance of $1,000 paid 94 days late; that due October 3, 1954, $1,000 paid 33 days late, and $1,000 balance paid 100 days late; that due April 3, 1955, $1,000 paid 95 days late and the $1,000 balance paid 100 days late; the $2,000 interest due April 3, 1956 was, as noted, part of the tender made June 4, 1956.
On February 16, 1956 the executors of the Logan estate and defendant finally formalized the mortgage extension letter sent by the executors some three years before. (The cause for the delay is not clear; plaintiff blames it on defendant's officers.) The agreement refers to that letter and provides that the mortgage be extended for a period of ten years from April 3, 1953, the $100,000 to be amortized as follows: no amortization for the first two years; "the third year of the extended term two percent (2%) amortization shall be paid; the fourth year of the extended term three percent (3%) shall be paid; and the fifth and succeeding *200 years during the extended term, five percent (5%) amortization shall be paid in each year, and the balance of unpaid principal, together with unpaid interest, shall be due and payable at the end of the extended term, to wit: April 3, 1963." The executors agreed not to demand payment of the principal, except for amortization, during the extended term, provided amortization, taxes and interest were paid when due. The agreement provided:
"5. All the terms, conditions, stipulations and provisions contained in the said bond and mortgage not inconsistent herewith are to remain in full force and effect."
The instrument was recorded as a mortgage, and sent to David Josephson, president of defendant company, by Mr. Stringer, attorney for the estate, on April 20, 1956.
On May 8, 1956 the Logan executors assigned the mortgage to the five residuary legatees as part of the winding up of the estate. A week later, on May 15, Stringer, as attorney for the residuary legatees, had a written notice served on Josephson, as officer of defendant company, stating that default had been made in the payment of taxes and/or interest on the bond and mortgage, which mortgage had been assigned to the residuary legatees, and on installment payments of principal under the extension agreement, and by reason of such default or defaults the residuary legatees were exercising their option and declared the whole principal debt due and payable immediately, together with all unpaid interest due thereon. Unless payment was immediately made, foreclosure proceedings would be instituted.
The assignment of the mortgage from the residuary legatees to plaintiff followed under the following circumstances.
Stringer testified that when the residuary legatees were in his office on May 8 they discussed a number of offers which had been made to purchase the mortgage, none of them concrete. They agreed they would take $85,000 for it. Such an offer was received from John Rogge, secretary of plaintiff corporation. On May 10, 1956 Mr. Stringer prepared an agreement whereunder the residuary legatees agreed *201 to assign the mortgage to Rogge for $85,000, $5,000 down payment and $80,000 on or before May 25, 1956, settlement to be at the office of the Chelsea Title & Guaranty Co. Rogge was to have the right to assign the agreement. The $5,000 deposit was paid. Stringer explained that this agreement was not executed by all the residuary legatees on May 10 because some were not present in Atlantic City: Mrs. Gosnell was in Baltimore and Mrs. Johnson in Reading. These two apparently executed the agreement at the same time they signed and acknowledged the mortgage assignment to plaintiff.
The attorney's testimony was that at the same time the Rogge agreement was prepared, there was also prepared the mortgage assignment from the residuary legatees to plaintiff S.D. Walker, Inc. The assignment was admitted in evidence and shows on its face that it was executed in Philadelphia County, Pennsylvania, by Mrs. Johnson on May 11, in Baltimore by Mrs. Gosnell on May 12, and signed and acknowledged in Atlantic City by the remaining three residuary legatees on May 15. Stringer testified that although the assignment purports to have been signed on May 10, 1956, he inserted "10th" after the instrument had been fully executed, and the paper remained in his possession until May 24, when he took it to the settlement. The mortgage settlement sheet shows that the settlement actually took place May 24, 1956, as testified. The checks of $20,000 and $60,000 in payment of the $80,000 balance show that they passed and were cashed on May 24. Distribution of $17,000 (one-fifth) was made to each of the residuary legatees the same day.
There can be no doubt whatsoever that the assignment into plaintiff did not take place until the latter date, so that when the May 15, 1956 notice of default was served on Josephson, the residuary legatees still owned the mortgage and had a right to exercise the option of demanding full payment of the principal sum due, contrary to defendant's contention. Plaintiff did not have to repeat the giving of notice; that sent by the residuary legatees was available to it, if necessary.
*202 Ordinarily, it is not necessary that a mortgagee give notice of default before he can institute foreclosure proceedings; the institution of the action is in itself sufficient notice of election to foreclose. A demand before bringing foreclosure, for failure to perform a condition or covenant of the mortgage, is necessary only where the mortgage itself expressly calls for notice or "where the mortgagee had previously waived the performance of the condition or covenant." Brown v. Royal Battery Corp., 131 N.J. Eq. 345, 351-352 (Ch. 1942); Gilbert v. Pennington Trap Rock Co., 135 N.J. Eq. 587, 590 (Ch. 1944); Annotation, 159 A.L.R. 1077; 1 Wiltsie, Mortgage Foreclosure (5th ed. 1939), §§ 40, 60 and 61, pp. 75, 114 and 116; 36 Am. Jur., Mortgages, §§ 393, 394, pp. 884-885 (1941). In nearly all cases in which it has been held that the mortgagee has waived default in the payment of taxes or interest, it has been found that the mortgagee either expressly consented to the default or made an express representation that he waived it. Brown v. Royal Battery Corp., above, 131 N.J. Eq., at page 351.
We proceed to dispose of a number of defendant's contentions. It is said that the acceleration clause in the mortgage is inconsistent with the extension agreement. We find nothing in the extension agreement to support such a claim of inconsistency and call special attention to the quoted provision of paragraph 5 of the agreement, above.
Defendant also claims that plaintiff has no standing to bring this foreclosure because the extension agreement was not expressly assigned. The agreement passed with the assignment of the mortgage; they form an integrated arrangement.
It is next said that no foreclosure can be grounded in the failure to pay the installment of amortization due under the extension agreement. This defense is a good one, since the mortgage provides for acceleration only in case of default of interest or tax payments. Cf. Olshan v. Chrystal, 101 N.J. Eq. 799 (E. & A. 1927). Both the mortgage and the extension agreement are silent as to what would happen in case of a delay in paying the 2% amortization in the third *203 year or the 3% in the fourth year of the extended term. It therefore becomes unnecessary to determine exactly when these payments fell due. It is clear beyond peradventure, however, that the 2% to be paid in the third year was overdue, since the third year, under the extension agreement, ran from April 3, 1955 to the same date in 1956.
There is equal validity to the defense that plaintiff could not foreclose because of the delay in paying taxes. Where there is default in tax payments which, under the terms of the mortgage, would accelerate the payment of the principal, such default may be neutralized if the taxes are paid before the complaint is filed. Williams v. Evenstein, 2 N.J. 60, 63 (1949); Haase v. Moser, 121 N.J. Eq. 344 (E. & A. 1937), affirming 120 N.J. Eq. 437 (Ch. 1936); Gilbert v. Pennington Trap Rock Co., above; 1 Wiltsie, Mortgage Foreclosure (5th ed. 1939), § 57, p. 108; 2 Jones on Mortgages (8th ed. 1928) 1006; 31 A.L.R. 733 (1924). As was said in Ewald v. William Fairchild, Inc., 139 N.J. Eq. 449, 452 (Ch. 1947):
"The real purpose of the tax default clause in a mortgage is to preserve the mortgagee's security unimpaired by the existence of unpaid taxes as superior liens on the mortgaged premises."
And see Williams v. Evenstein, 2 N.J., above, at page 63.
Defendant's suggestion that there was an obligation on the part of the residuary legatees, or plaintiff, to notify it of the mortgage assignment, need not detain us. There was no such duty. However, defendant's ignorance of the assignment until it was recorded on May 25, 1956 does explain part of the delay in being able to make an immediate tender. Some of the time between that date and June 4 was spent in the further effort to find out just who the officers of plaintiff corporation were, and this was done through the Secretary of State's Office in Trenton. The tender promptly followed.
It is well settled that an assignee of a mortgage succeeds to the rights and privileges, as well as to all the disabilities, of the assignor. Byram Holding Co. v. Bogren, *204 2 N.J. Super. 333, 336 (Ch. Div. 1949). R.S. 46:9-9 expressly provides that in an action brought by an assignee on a mortgage, all defenses that would have been allowed against the assignor in an action brought by him and existing before notice of the assignment, shall be available to the mortgagor. The assignee takes the mortgage subject to all defenses which the mortgagor may urge against it, whether the assignee has notice of such defenses or not. Di Giovacchini v. Teich, 133 N.J. Eq. 107 (Ch. 1943); 2 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 704, p. 995.
This foreclosure, then, cannot be supported by defendant's failure to pay taxes or the installment of amortization when due, since the taxes were paid before action instituted and a valid and continuing tender made of the $2,000 installment payable in the "third year." Is the action maintainable for failure timely to pay the $2,000 semi-annual installment of interest due April 3, 1956? As noted, defendant asserts that its failure to pay the interest on time, as well as the taxes, was occasioned by the prior acts of the original mortgagee, Mrs. Logan, her executors and the residuary legatees. It is established law that if the mortgagor's default was the result of the conduct of the mortgagee, a court of equity will relieve the mortgagor from the effect of the acceleration clause. Freund v. Weisman, 101 N.J. Eq. 245 (E. & A. 1927); Annotation 70 A.L.R. 993 (1931); and see Gilbert v. Pennington Trap Rock Co., above, 135 N.J. Eq., at page 591.
Defendant cannot succeed in defeating plaintiff's right to bring foreclosure merely because it made a tender of the April 3, 1956 interest payment on June 4 following. In O'Connor v. Meskill, 39 A. 1061 (Ch. 1898) (not officially reported), it was expressly held that after default in paying interest a mortgagee was not required, even before his election to accelerate the principal, to accept payment of the overdue interest. In commenting upon this case, the Court of Errors and Appeals in Haase v. Moser, above, 121 N.J. Eq., at page 345, said: "We think this has been the uniform practice *205 in this state." And see Gilbert v. Pennington Trap Rock Co., above, 135 N.J. Eq., at page 592.
As for the interest payments in the instant case, we can pass over those relating to the period from April 3, 1950 (when the mortgage was given) to the end of the receivership in the spring of 1953, because they provide no reliable pattern as to what the attitude of the original mortgagee was toward late payments. All arrears were cleaned up following the receivership. Fastening our attention upon what happened in 1953, 1954 and 1955, and referring to the listing of late payments made after the expiration of the grace period, it will be noted that all the interest due April 3, 1953, half of that due April 3, 1954, all the interest due October 3, 1954, and all due April 3, 1955, was paid quite late. As far as the testimony reveals, the Logan executors, who stood in the place of the mortgagee, made no protest and threatened no action, nor did the residuary legatees who expected to be the eventual owners of the mortgage.
The acceptance by the executors of defendant's late interest payments wholly corroborates the testimony of Josephson, defendant's president, that when he saw executor Gosnell in Baltimore in May 1953 regarding the extension agreement, Gosnell exhibited a sympathetic attitude about future payments of taxes and interest. Josephson pointed out to him that most of the hotel's business was done in the summertime, when monies would become available, and Gosnell assured him this would be all right. Gosnell was not produced to contradict this story. Nor was Dart, the other executor, located in Atlantic City, produced to explain the acceptance of late payments.
We turn to the events which transpired between the interest due date of October 3, 1955 and the final assignment of the mortgage to plaintiff. It is not necessary to accept all of Josephson's testimony regarding his negotiations with Shumpert Logan, residuary legatee and husband of the original mortgagee, looking toward the purchase of the mortgage at a discount. He said that in the course of these negotiations he first offered $75,000, and actually obtained and exhibited *206 to Logan the written commitment of an Atlantic City bank that it would lend him $100,000, some $23,000 of which would have gone toward the payment of a debt due the bank, the remaining $77,000 to be available for the mortgage. Logan testified he raised his offer to $78,000 and then $80,000, which was intended to clean up any back interest due and to obtain an assignment of the mortgage. We recognize that Logan did not at the time actually own the mortgage, but as residuary legatee he was the prospective owner. According to Josephson, Logan said he was transmitting his offers to the executors and the co-legatees.
Though credibility is not to be accorded every detail of Josephson's story, truth lies at the heart of it, because when Logan took the stand he said that Josephson sought him out about March 1, 1956 and spoke to him about buying the mortgage. Josephson showed him a letter wherein the bank committed itself to a $100,000 loan. Logan said he informed Josephson that they had better offers, and this was repeated on later occasions. He inquired whether Josephson could better his offer. Josephson's alleged answer was "no"; he would not go higher than $75,000.
Logan further testified that Josephson specially requested that he let him know when any other offer was made, and he promised to do so. An offer of $85,000 was received on May 2, 1956, and Logan says he told Josephson about it. Logan fixes the date as May 2 because, he says, he spoke to the residuary legatees the next day. I do not believe that he communicated any such $85,000 offer.
Plaintiff's purchase of the mortgage came about through its secretary, John Rogge. He learned of the mortgage from a local realtor, Lindsay, who mentioned its availability before May 10. (Lindsay did not testify.) It is to be recalled that the residuary legatees first discussed what they would take for the mortgage when they met with the executors on May 8, and the testimony reveals that they settled on a minimum price of $85,000. Rogge was definite in his testimony that he did not speak to the interested parties until May 10, when he talked to Stringer, who was representing *207 the residuary legatees. There was a meeting later that day at which Rogge, Stringer, Logan and Elias Naame, an attorney, were present. Rogge had with him a $5,000 check, drawn on the special account of S.D. Walker, Inc., and payable to Stringer as attorney. Then and there Stringer drew up not only the agreement between Rogge and the residuary legatees, but also the assignment from the latter to plaintiff company, which instruments were eventually executed in a manner hereinbefore described. Within five days, and while the transaction was in full motion, the residuary legatees sent their notice of default to plaintiff by their attorney. They gave no indication of the proposed assignment to plaintiff.
Rogge frankly admitted on the stand that he knew on May 10, 1956 that the taxes and interest were in default and that he was buying a forecloseable mortgage or one worth $100,000. There is, of course, nothing wrong with one buying a forecloseable mortgage at a discount. All other things being equal, the assignee of such a mortgage has a complete right to rely upon contractual stipulations legitimately included in a mortgage instrument.
There are a number of elements that appear in this case, however, which call the conscience of a court of equity to the relief of the mortgagor. First, there is the pattern of late payments of taxes and interest, accepted without prior demand so far as the record shows, or protest, or threat of foreclosure. Next, there is the period of at least three months, if we consider only Logan's testimony, during which Josephson sought to buy the mortgage at a discount. There can be no question but that Josephson was actively and vitally interested in acquiring the mortgage given by the company in which he was the only substantial stockholder and moving force. If, as Stringer testified on rebuttal, Logan reported to the May 8 meeting of the residuary legatees that Josephson was willing to offer $75,000, and the heirs expressed themselves as willing to let him have the mortgage if he went to $80,000, it is strange that this was not in some manner communicated to Josephson. It is not unreasonable to believe *208 that he would have tried to meet this offer, and thereby effected a saving of $20,000, rather than let the mortgage fall into the hands of some stranger who would eventually and inevitably insist upon full payment.
An additional element to be considered is that during the critical period under examination a formal extension was entered into on February 16, 1953, and sent by Stringer to Josephson on April 20, following recordation. First quarter taxes had fallen due February 1, and the semi-annual installment of interest on April 3, 1956. Although there is some testimony that the lateness in payment was called to Josephson's attention, no written demand was made or foreclosure threatened. If anything was in fact said to Josephson about this, his failure to pay is explainable in the light of his hope that he could buy the mortgage.
Plaintiff's rights, as assignee, can rise no higher than those the executors or residuary legatees would have had. The court is persuaded that defendant's failure to make timely payment of taxes and interest was the result of the conduct of the executors and the residuary legatees, through whom the mortgage came to plaintiff. The good faith of defendant is evident from its actions after notice of default was served May 15. The same may not be said of plaintiff.
In view of all the circumstances it would be inequitable to permit plaintiff to proceed with this foreclosure. Its security has not been impaired. All taxes have been paid, both those prior to suit and after, and defendant has made a continuing tender not only of its original check of $4,041.37, but has, in addition, sent plaintiff its certified checks for the interest which fell due October 3, 1956 and the $3,000 installment of principal due under the extension agreement. These checks, like that tendered June 4, 1956 were not accepted and returned.
The complaint will be dismissed, with costs.